and I would like to discuss two issues this afternoon. The first is whether, in light of the intervening Supreme Court decision in Burlington Northern, the ruling below by the District Court holding that under CERCLA, Ward Warner had arranged for the disposal of hazardous substances must be reversed. Secondly, if the District Court ruling can no longer stand, should this case be and remanded or should it simply be dismissed? The facts can be very simply stated in less than 60 seconds. Ward Warner owned Norge at a time when Norge made an automatic dry cleaning machine. The dry cleaning machine used something called perchloroethylene, which to save my time I will refer to as PERC. PERC is a hazardous substance. Between 1961 and 1975, a Tyler, Texas dry cleaning facility used between six and eight Norge machines. Vine Street now owns that site, our appellee. Years later, it was discovered that PERC had entered the groundwater near the dry cleaners and needed to be cleaned up. In 2003, Vine Street sued the lessee who ran the dry cleaners and the company that at that time was the owner of Norge. In 2004, the complaint was amended to include Ward Warner, my client, the previous manufacturer of the of Norge. Ward Warner sold Norge in 1968. Let's move up to 2005. The District Court in 2005 in a recorded decision, reported decision, dismissed negligence claims against the lessees and the then current owners. This was the equivalent of a products liability claim. It said the Texas statute of limitations has run. Let's move on to the rest of the case, which is a circular case, where the claim was that my clients had arranged for the disposal of PERC. And after a two and a half day trial, Judge Davis agreed with the plaintiffs. He found Ward Warner liable as an arranger under circular. He said that because the machine itself, because Norge had built this with a water separator that allowed PERC to somehow escape into the sewers, a very, very small amount. You know, I was thinking about those water separators, and were they, would it be fair to say that they were 99% effective? Your Honor, there was a slight disagreement at trial as to the effectiveness. The Vine Street's experts said 95%. Our expert said 99%. But that's the only difference. The intent was clearly to save the PERC. It's not like a normal washing machine where all the fluid goes out. They want to save the PERC because it's very expensive. Use it again. Use it again. And they want to get the water out, because if you don't get the water out, and sometimes your clothes just are humid, and the clothes themselves have moisture, then the water will interfere with the operation of the PERC. So the separator was designed, and it got between 95 and 98% of the water out. The District Court found Ward Warner liable. And Norge knew this. Yes, sir. Norge knew that they were not totally efficient. He said that there is some evidence that Norge knew they were not totally efficient. And the reason he said that was because he noted that in 1964, or shortly thereafter, Norge redesigned the machine to make it more efficient. And so he imputed knowledge to Norge. But what he said was that under the totality of the circumstances, Norge effectively exercised actual control over the disposal through the design of the machine. And then he went to a Third Circuit case called Morton International. And in that case, he relied upon a holding that says, knowledge that hazardous substances are being disposed of, if it's an inherent part of what you're making, that's sufficient to And then the judge said, based on the totality of the circumstances, he found a nexus, a nexus between Norge and PERC disposal that establishes that Norge arranged for the disposal and therefore triggered liability under circling. The judge made one other finding, however, that's important to us and to this court. He found that neither party intended to arrange for the discharge of PERC into the ground. Now, that was before Burlington. Yes, sir. What happened was that we took an appeal and shortly after we filed our opening brief, Fedders declared bankruptcy. This court put the case on hold and it stayed there for almost seven years. Fedders was ultimately dissolved, but in the and was decided. And this is the classic case of what we in DC refer to as OBE, overtaken by events. If we did not have the Burlington Northern case today, it is possible that the outcome might be considerably different. We are not challenging any of the facts that Judge Davis found. What we are saying is that the Supreme Court has changed the law. Let's take a look at the Burlington Northern case. Dragged out by time. Your Honor, this happens sometimes. In the Burlington Northern case, Shell manufactured agricultural chemicals and it sold them to a distributor. It made them, it transported them, and it sold them to a broker. And it knew that in that process there were spills of those agricultural chemicals. The U.S. filed a lawsuit, circle lawsuit, against the railroads who owned the property and against Shell. They said, Shell, you're an arranger. And the Ninth Circuit, the Ninth Circuit said that it doesn't matter whether there was intent to dispose or not because Shell's arranging for a transaction in which there would be leakage or spillage is sufficient under CERCLA to establish arranger liability. And in an 8 to 1 decision, the Supreme Court said, not so fast. We're going to reverse. And we're going to reverse because you need actual intent to dispose. Did you argue in the District Court that there was an intent requirement? Or is this now that Burlington Northern came down for the first time on appeal? No, we argued, Your Honor. And, Mr. Ferrello, there is a host of cases, going back to this court's decision in Dayton that says if you manufacture a useful product, you're not liable under CERCLA, if that's the purpose of it. It was not our intent to do that. And what the, what the... I answered Judge Costa's question specifically. Did you argue intent in the context that it was decided in Burlington? We, we wrote that brief before Burlington. That brief... Does your brief anticipate Burlington? We argued that the liability, the district court... My answer is no. The answer is no. I get it. The answer is, to my recollection, we didn't specifically argue it, but we also said that it wasn't... If I assume that you did not argue intent... Yes. What, what would be the effect of that, of my conclusion to that effect? Would that, would that kick you in the teeth? No, sir. It would not for the following reasons. What the district court decided is no longer valid law. Intent is critical. Intent is the door through which you must pass to get to other factors. But once you do not have intent, and given, given what the district court found, that we had no intent, there was no reason for us to challenge that. What we did challenge was that we had actual control. All right, now, how would you argue the case if Burlington was not available to you? We would argue it as outlined in our opening brief. And, and it's a robust brief that argues that under the law at that time, Burlington, uh, Board Warner does not have circular liability. For what reason? Because of, because it was a valuable product? Because there was a useful product, because the mere design of this was inconsequential, because we did not own it. Has the law, has the law of useful product changed since this case was decided? I'd say the useful product law has gotten a slightly more robust, Your Honor. And how, on what basis would you say that? I would say that because what the, what the Supreme Court said in, in Burlington Northern demonstrates that in a circular context, you really need intent to dispose, particularly if you're dealing with a useful product. What the court said, assuming, assuming we read Burlington to say that if you establish that it's a useful product, there is no liability. I mean, they suggest that. Absent other factors. Now, um, does that, does that, is that a home run for you? I think it is. And I think the way you, why was this a useful product? This was useful. Tell us how you fit into that doctrine. Because PERC is expensive and PERC was repeatedly reused. And the whole purpose, as the Knights, I'm sorry? And the useful product doctrine seems to me where you're supplying the chemical. I mean, this is your ownership argument. You don't even, except for that very first batch, your client didn't even own the chemical. Exactly, Your Honor. And, and, and as we note in our opening brief, the district court himself noted that there was just a small amount of what we owned that, you know, that was provided, everything else, the lessees purchased from, from an outfit in Lufkin, Texas. Is the useful product doctrine available to you if you are not the seller of the useful product? I think it is because again, we have to go back to intent. We have to go back to intent. And the way we get back to intent among other reasons is to look at Judge Ginsburg's dissent in Burlington Northern. Judge Ginsburg said, wait a minute. Schell specified the equipment that would be used to deliver this agricultural pesticide. It, it designed and required specific action. It had, in the words of Judge Davis, actual control over the delivery. And Schell knew that spills and leaks were an consequence. In fact, Justice Ginsburg said, it happened every time. And under those circumstances, given the control that Schell had over the delivery and transfer to the customer and the 20 years of knowledge of spills, that's sufficient to qualify as an arranger liability. And the Supreme Court said, we're sorry, Your Honor. You've just been outvoted eight to one. Now, that was Judge Davis's theory. That's what Judge Davis said. Judge Davis said, Norge ran everything. These people just turned their machines on, turned them off. It was inevitable that some perk would leak. And although it wasn't Norge's intent to contaminate, nevertheless, they knew of it. They knew of it. And what happened was that when Burlington Northern came along, it divorced knowledge from intent. It was a new world. If I may just make a few other points before my time runs, I'll save a few minutes for rebuttal. Under these circumstances, accepting all the facts as found by the judge, we're simply challenging the application of the law as it stands today. And the question then is, if you agree with us that the law has changed, if you agree that this decision can no longer stand, what do we do? There were three or four or five references in the Appellee's brief. Send it back. We think not. We think that under these circumstances, the court should follow what other courts have done, dismissing cases when intent has not been pled. Your Honors, this is basically a products liability case masquerading as a circle arranger liability case. And the products liability negligence claim was dismissed on statute of limitations. There's nothing left to try. We have a very busy docket. We have an incredibly conscientious judge. We send it back to him once more. There's nothing for him to do with that. When thank you. Please. The court counsel. Your Honors. What I want to know, first of all, is that there's several discrepancies in what the appellants have just said. First of all, it was known from the inception in this case that this water separator inherently leaked perk. It inherently disposed of perk into the system, and the undisputed evidence was that everybody knew that nobody denies it now. No, Your Honor. Nobody denied it then. Everybody. In other words, everybody acknowledges that it was not totally efficient. The question is, it leaked somewhere between five between four and 5% between three and 4% per ethylene in the entire dispute at the court. Norge never said, Hey, we didn't. We didn't know that it leaked. Burlington comes along and says that knowledge is not enough to tag him with liability, says knowledge. I'm sorry, Your Honor, says says knowledge may be enough now where the loan is not enough. Exactly. But here's a difference in this case, Your Honor. It was look at the facts specifically set up by the court below and what Judge Davis did. Uh, college cleaners. This building was designed. Layout specifications were all done by Norge. Norge supervised the construction of the building. Why is all of that relevant to the cases that's presented on appeal today? Because, Your Honor, they engaged in intentional acts that were designed to dispose of perk. Okay, so so you're accepting the fact that that the act of Norwich had to be an intentional act. I don't think so. I think in taking for arguing for it like the victims. Well, Your Honor, I think that we comply. I think that we comply with Burlington. And here's why, Your Honor. What Norge did. They designed not only the system that was put in place with the knowledge that it was gonna leak perk. They're the ones that actually plumbed it to the sewage system. They designed everything. They designed the sewer system. They designed the building. They designed the equipment, and they knew they knew and intended for perk to go down the drain into the sewer system. What the court found is that nobody intended to contaminate the ground in the ground water. That's all the court found. But it was the court found that it was intended for perk to be disposed of into the sewer system. What was unknown at the time is that the rubber gaskets in the sewer system would be eaten away over time by perk, and that perk would accumulate between the pipe joints and leach it down into the system where the court said at one point, the court said, um, what kind of intent we're talking about? You said the court said that there was no intent to discharge perk into the ground water. No, sir. What? What I said ground into the ground into the ground into the ground. Same thing. Yes, Your Honor. But here's a distinction. So what intent are we talking about intent to put it in the ground or intent to just put it in the sewer system? What are we talking about when we refer to intent? Yes, sir. The specific circle language says intent to dispose of, which includes the sewer system. They intended to put perk in the wastewater down the sewage system. That intent was everybody admitted that intent was there. And the question it's like firing a gun. I tell her what I hear from the other side. Well, Your Honor, he was to be honest with. He was not a trial. The argument at trial was not whether they intended to discharge perk and not whether they knew that they were discharging perk. The argument at trial was how much perk was actually going down into the sewer system and whether that amount of could have created the bloom of perk that's contaminated this property and about five others. That was the argument at trial. So, Your Honor, I mean, it was known a trial that they intended and designed the system to release. Point of view. Burlington doesn't change a thing. Doesn't change a thing. We've got it four square. Um, it's inherent in the we don't have to know or intend that it going to the groundwater. We don't have to know or intend that the baby's got a hold of it, that it could cripple him or kill him. The intent is just the act, the intent of discharging it into the environment. And that discharge includes sewer systems. Okay. Nobody intended to charge it into the ground of the groundwater. Put it in terms of the statue, which is to me is confusing. Arranger. I mean, I could figure out why the liability was on an arranger. But what you're saying is that they were an arranger. They weren't because they disposed of it. And that makes them an arranger. Yes, sir. Then when they do it with intent, it makes them liable for having disposed of it. Yes, sir. Exactly. And, you know, you can mince words. They knew that their water separator was discharging perk, which is a substance that shouldn't be discharged down into the sewer system. They knew it. They had an intent to do it. Everybody in the industry at the time who plumbed it to the sewer systems knew. But most of the other companies didn't put it in the sewer system. It would go into a bucket to be reclaimed later. Norge went out and actually plumbed these very machines to the sewer system, designed everything arranged with it. And at trial, they admit that everybody admitted that this water separator was going to discharge perk into the sewer system. All right now, from your point of view, it doesn't matter whether they just furnished a small amount of perk at the early date. Uh, they're not liable simply for that perk. You know, actually, they they provided 400 gallons of perk over the life of these machines. Those machines used about 2000 gallons of perk. They supplied 1 5th of the total perk used in this facility over a 15 year period. A big percentage. Does that reduce their liability by 80%? No, sir, it doesn't. You know, this is not. They keep on talking about a useful product exception, which I don't believe they raised below, and I believe they've weighed. But this is what the Supreme Court said about the useful product exception. If a similar if it is similarly clear that an entity cannot be held liable as an arranger merely for selling a new and useful product, if the purchaser of that product later and unbeknownst to the seller disposed of the product in a way that led to unbeknownst to the seller, the seller knew it. The seller set up the system. The seller designed it. The seller plumbed it to the sewer system, and the seller, Borg Warner in this case, sent the perk down into the sewer system for the first time. That is an intentional discharge of perk down. It's an intentional discharge. Whether or not they knew that it was going to contaminate five properties or not, that doesn't matter. Now, the court did go back knowledge of what they of what it would do, and then they put it in the system with intent to put it in the system, and that satisfies liability against them. Yes, Your Honor. Intentionally discharging it into the sewer system satisfies liability against them. It doesn't matter. 15 years later, we find out that five pieces of property are contaminated by it or someone's been injured by it. The results don't have to be anticipated. It's the intentional act of disposing of it and putting it down the sewer system. That's the important fact. Just incidentally, how much money is involved in this case? Your Honor, I don't know what their their attorney's fees are. Things like that. But I thought about that over again that what are the damages? Uh, today, I believe right at a million dollars have been spent for the cleanup of the property by, uh, Russian Genicove and their insurance company at the time, and we don't know eventually down the line and why we're fighting about this and arguing about it is we don't know what's gonna happen in the future. No one knows. What we do know is that Norge came out there, designed the system, knew that Perk would go down into the sewer, intended for Perk to go down into the sewer and under Circla and the broad provisions of circle liability. They're responsible some potential, uh, damage liability for damage to humankind. There there's a potential out there, Your Honor. We don't know what that potential is yet. There's no incident of any human being harmed about this particular discharge, Your Honor. Not that we know of. And we're keeping our fingers crossed that nothing like that happens. That's certainly not something that we want. Um, but, Your Honor, I think it is very instructive on the intent issue. Um, we've talked about how limited the court's statement was about discharging to the ground. It's not the issue. It's the intent of discharging it into the sewer. That's an issue here. Additionally, Your Honor, uh, the key to this case, and I believe the key to this case is that the test of Burlington Northern is met. And here's a test in order to have entered into the transaction with the intention that at least a portion of the product be disposed of. And that was their intention. They knew that would happen. That was their intention. That's why you have to keep on actually, though, because in Burlington Northern Shell was involved in the transfer of the chemical knew that some leakage was likely disposal of a hazardous substance was less a necessary part of the sale when they're saying they knew just like here that some of this was gonna get into the ground. I just don't see how you're distinguishing it. Your Honor, it is actually incredibly distinguishable. Shell involved accidents by third parties. Shellman gonna happen. It was inevitable. That is my reading of the case, because Shell knew that that's what they started increasing all these security measures because it was just happening left and right. People people had accidents. This is not a case where somebody dropped a container of perk, and it leaked into the ground. That's the distinction here. There was an intentional act by Borg Warner to discharge this chemical into the sewer system. Your Honor, the shell case is simply third parties. It's like oil and gas. You produce oil and gas. Everybody who produces oil and gas knows that somebody's gonna spill some of it. That's an accident. If you had a gas company that hooked something up to the sewer line and intentionally disposed of gasoline, that's a different question. We're not saying that this was an accident. It wasn't an accident. Shell involved accidents. But like perk is a useful product in the sense that it's necessary to clean clothes and such as that, I guess. And the so what you're saying is that it is no accident. It is a leak for not to be 100% efficient. No, some leakage because it wasn't 100% efficient. It's not some sort of has no characteristic of an accident. No, sir. It's not an accident. It's an intentional act. You know, you can argue over how much perk over time leached into the ground in the groundwater. But that's not the question. The question is, did they intentionally install this machine and discharge perk into the sewer system? And the undisputed evidence is they did. The only dispute is as to the amount. And the court found that the amount that was leaked over time was responsible for this perk bloom. It only takes seven or eight gallons to create this bloom and injure these five properties. It's a It's a terrible product. It's not used anymore. Perchlorethylene is not used in dry clean. Not to my knowledge. I think they stopped. I don't know if it is your honor. I'm wrong, but I don't think it's used anymore. My clothes don't smell like it anymore. So that's what I guess I'm basing it on. But your honor, in this particular case, the intent issue is just there, and it distinguishes it from all the other cases. If I go out to give you an example, if I'm in the oil and gas business truly, and I've got a well site, and I say, Okay, well, some of this that we're bleeding off is not gonna be. We're not gonna be able to sell it commercially, you know, and it's gonna cost a lot of money to send it through a reclaimer. So what we're gonna do is just have another pipe that discharges the bad stuff, the stuff we don't really want into the sewer system, be it to salt water or the hydrocarbon remains. Well, we're disposing of a hazardous substance, and essentially, that's what's happening here. They're disposing of a hazardous substance, and they intended to do it. It was an industry standard at the time, and it was undisputed at trial. The only argument was the amount that was being disposed of, and the district court found that there was no other way that this perk bloom could have been created at that location than it coming through the sewer system. It could not have occurred if they spilled it on the concrete. Nobody's challenging that. No, Your Honor. In fact, I don't think they're now challenging any of the facts. But, Your Honor, Dr Peter Krasnoff. I mean, he goes into it at length. There were only three experts in this case. Two were ours, and one was theirs, and the court found that their expert was not credible. But even he agreed that they were intentionally discharging perk through their water separator. It was known it would do it, and when they set it up to the sewer system, they intended to do it. The issue is whether or not the amount that went down the sewer system would cause a damage. And then the court came back and said, You know what? When I'm assessing the percentages, and that's what the court was doing when I'm looking at assessing the percentages to put on board and the percentages to look to put on Vine Street. I also know, by the way, that was bad and leaking a whole bunch more perk than was intended because you went back and changed the design two years later. So I find that y'all were letting a lot of it go. One of your problems, it seems to me, and I can probably work my way through it, is intent has a certain, uh, is a term of art here. And, uh, it sounds to me you're not using it as a term of art. I can't quite figure out, like, intentionally caused harm. I can't figure out what you mean by intent. There doesn't have to be an intent to contaminate the groundwater. In these circular cases, all there has to be is an intent to discharge a substance that's like knowledge. I mean, you know, you know you're doing it. Uh, everybody intends to do what they do unless it's an accident. I mean, if I go to that, I intentionally walked to that door. But that's different from kind of intending to walk to that door for the purpose of some harm for an additional, uh, Santa, maybe of intent. I see your point, Your Honor, and I think it's a very good point. And I want to address that because I've been struggling with that myself. You know, knowledge and intent really are terms of art, and they can be used interchangeably. If you're knowingly doing something, if you're knowingly discharging a substance down into the sewer, knowing that it's going to be discharged down into the sewer, and you set it up so that it does discharge it down into the sewer, then you're intending that it happened. You know, you can play word games, but we intend the natural consequences of our acts. Yes, Your Honor. So did they intend? They obviously intended to do what they did. Yes, Your Honor. But did they do it? Did they intend to do it with the knowledge that it was going to cause the harm that they're now charged with? And that's what we're talking about. Well, I think there's two separate issues, Your Honor. Under CERCLA, the only thing required is that you intend to discharge the substance. At the time, this occurred before CERCLA was inactive. You know, you don't have to have the knowledge that it's going to create a plume and put in jeopardy five pieces of property. You don't have to know what the actual consequences long term are going to be. It's the discharge of that chemical. Just in your definition now, I mean, you're acknowledging intent interchangeably right now. Well, and I think the court did that, too. And I think the courts have done that. But I think the bottom line here is they intended to discharge PERC. So I'm almost out of time, Your Honor. Can I answer any other questions? Thank you, Mr Davis, for a good argument. Thank you very much, Your Honor. Mr. Stanley. Let's go back to intent, Judge Shelley, because that's really what we're talking about here. There is no finding that Norridge or Borg-Warner intended to dispose of PERC. And if we look at how the district court dealt with it, what the district court said was there was some evidence that Norridge actually intended the natural consequences of their act, and they had that knowledge that the PERC was being disposed in minute sums, perhaps. They had that knowledge, and they intended the consequences of that act, of their acts. And when it seeped out, they intended that act. So that leaves me kind of hanging. I don't think so. Certainly that's where Judge Davis was before Burlington Northern. But what the Burlington Northern case said was the Burlington Northern case looked at very similar facts, where they said, we find knowledge where Shell did almost the same thing that Norridge did. They tried to make the product more efficient. Shell also tried to do that. And the Supreme Court said, we don't take that as knowledge of intent to dispose. Exactly the opposite. We take that as recognition that it didn't intend to dispose because this was a useful product. It was trying to save it. And so if the court looks at the decisions involving dry cleaning post Burlington Northern, cited in our reply brief, you will find repeatedly recognition, as this court said in Selanese, that Burlington Northern changed the ground rules. And so you have the Ninth Circuit saying there was no showing that the sale of a Norridge machine was a waste disposal machine. There was no showing that when somebody sold this, they intended to dispose of PERC. And let me close by suggesting this. There's a good reason for that. Burlington Northern makes perfect sense. This morning, I went back and quickly revisited the EPA website on hazardous substances. Revisited what? Revisited the EPA website on hazardous substances. EPA says in the first sentence on the website, every day, almost every American in the country comes into some experience with millions and millions and millions of products that use hazardous substances. That's the nature of our environment. We use them all the time. Whether it's dry cleaning or something else, we use them. They are manufactured. They are distributed. They are applied. And the EPA did not design Congress to be a product liability negligence standard. Instead, it was designed, as this court has recognized, in the case involving asbestos in the schools, that it was intended to cover midnight disposal. It was intended to catch people who were using subterfuge. This was not the intent of Norridge. And for those reasons, I believe the decision needs to be reversed. And in suggesting reversal, why we don't need a remand? Let me just close by saying, if your honors want, put your district court hats on. Take a look at the complaints and say, would these complaints today survive a rule? The requirement would be to simply dismiss the case. Thank you very much.